ACCEPTED
13-14-00756-CV
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
3/2/2015 4:08:08 PM
DORIAN RAMIREZ
CLERK

## CAUSE NO. 13-14-00756-CV

## IN THE COURT OF APPEALS
## FOR THE THIRTEENTH JUDICIAL DISTRICT
## SITTING AT CORPUS CHRISTI - EDINBURG, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
3/2/2015 4:08:08 PM
DORIAN E. RAMIREZ
Clerk

**VALLEY BAPTIST MEDICAL CENTER**                    **APPELLANT**

## VS.

**ROSALINDA BATTLES, GERALD
BATTLES, AS SURVIVING SPOUSE
OF ROSALINDA BATTLES,
AMANDA GISELLE BATTLES, AS
SURVIVING CHILD OF ROSALINDA
BATTLES AND JEREMY BLAKE
BATTLES, AS SURVIVING CHILD OF
ROSALINDA BATTLES**                    **APPELLEES**

## APPELLANT'S BRIEF

## ON APPEAL FROM CAUSE NO. 2013-DCL-04983
## IN THE 444TH JUDICIAL DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

**SCOTT T. CLARK
ROGER W. HUGHES
WILL HUGHES
ADAMS & GRAHAM, L.L.P.
P.O. Drawer 1429
Harlingen, TX 78551-1429
Phone: (956) 428-7495**    **ORAL ARGUMENT IS
Fax: (956) 428-2954**    **REQUESTED**

**Attorneys for Appellant VALLEY BAPTIST MEDICAL CENTER**

# IDENTITY OF THE PARTIES AND COUNSEL

1.      Appellant:

| Defendant | Attorney |
|---|---|
| Valley Baptist Medical Center-Brownsville | Scott T. Clark<br>*sclark@adamsgraham.com*<br>Roger W. Hughes<br>*rhughes@adamsgraham.com*<br>Will Hughes<br>*willhughes@adamsgraham.com*<br>**ADAMS & GRAHAM, L.L.P.**<br>P. O. Drawer 1429<br>Harlingen, TX 78551-1429<br>Phone (956) 428-7495<br>Fax  (956) 428-3954 |

2.      Appellees

| Plaintiffs | Attorneys |
|---|---|
| Rosalinda Battles, Gerald Battles, as Surviving Spouse of Rosalinda Battles, Amanda Giselle Battles, as Surviving Child of Rosalinda Battles and Jeremy Blake Battles, as Surviving Child of Rosalinda Battles | Robert Garza<br>jrobert@rgarzalaw.com<br>Myles R. Garza<br>myles@rgarzalaw.com<br>Law Office of Robert Garza, P.C.<br>1200 E. Harrison St.<br>Brownsville, TX 78520<br>Phone (956) 544-1111<br>Fax (956) 544-1108 |

**TABLE OF CONTENTS**

Page:

IDENTITY OF THE PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    When the purported report is "no report," no extension
        is permitted and the trial court must dismiss. . . . . . . . . . . . . . . . . . 1

    B.    Nurse O'Malley's first report stated no opinions
        and was "no report." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Caselaw demonstrates the trial court was obligated
        to grant VBMC's first motion to dismiss. . . . . . . . . . . . . . . . . . . . 5

CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

# TABLE OF AUTHORITIES

Page:

Cases:

*Avila v. Jimenez*, No. 13-13-00101-CV, 2013 WL 1500328
(Tex. App.–Corpus Christi 2013, pet. denied) . . . . . . . . . . . . . . . . . . . . . . . 3

*Badiga v. Lopez*, 253 S.W.3d 204 (Tex. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Fung v. Fischer*, 365 S.W.3d 507
(Tex. App.–Austin 2012, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Haskell v. Seven Acres Jewish Senior Care Servs., Inc.*,
363 S.W.3d 754 (Tex. App.–Houston
[1st Dist.] 2012, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5-7

*Laredo Tex. Hosp. Co., L.P. v. Gonzalez*, 363 S.W.3d 255
(Tex. App.–San Antonio 2012, no pet.) . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 9

*Ogletree v. Matthews*, 262 S.W.3d 316 (Tex. 2007) . . . . . . . . . . . . . . . . . . . . . . . 2

*Reddy v. Hebner*, 435 S.W.3d 323
(Tex. App.–Austin 2014, pet. filed) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*San Antonio Extended Medical Care, Inc. v. Vasquez*, 358 S.W.3d 685
(Tex. App.–San Antonio 2011, pet. denied) . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Scoresby v. Santillan*, 346 S.W.3d 546 (Tex. 2011) . . . . . . . . . . . . . . . . . . 1, 2, 5, 9

*Sinha v. Thurston*, 373 S.W.3d 795
(Tex. App.–Houston [14th Dist.] 2012, no pet.) . . . . . . . . . . . . . . . . . . . . . 3

*Velandia v. Contreras*, 359 S.W.3d 674 Tex. App.–Houston
[14th Dist.] 2011, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## STATEMENT OF THE CASE

This is an expert report appeal in a healthcare liability claim. Appellees asserted medical negligence claims against appellant Valley Baptist Medical Center (VBMC) and provided an expert report from a nurse, Erin K. O'Malley. C.R. 5-15, 40-48; R.R. IV, X-1. App. 1. VBMC challenged the report and moved to dismiss. C.R. 35-38. The trial court granted a thirty day extension, and Nurse O'Malley provided a revised report. C.R. 51-52, 63-66; R.R. IV, X-2. App. 2. VBMC again moved to dismiss, and that motion was denied. C.R. 53-59, 75. App. 3.

## ISSUES PRESENTED

1.  Was the first report from plaintiffs' expert, Nurse Erin K. O'Malley, "no report" because it:

    a)   failed to say anything about the standard of care for VBMC;

    b)   failed to say anything about how VBMC violated any standard of care;

    c)   failed to say anything about how any breach of a standard of care by VBMC caused the death of Ms. Battles; and

    d)   failed to offer any opinion opinion that appellees' claims have merit?

2.  If the first report was "no report," did the trial court have discretion to grant an extension to cure deficiencies in the report, or was the trial court obligated to grant VBMC's motion to dismiss?

## STATEMENT OF FACTS

On July 24, 2013, appellees sued Valley Baptist Medical Center (VBMC), alleging that insufficient post-surgery monitoring of Rosalinda Battles caused Battles's death. C.R. 5. On November 21, 2013, VBMC received appellees' purported expert report and C.V. from Nurse Erin K. O'Malley. C.R. 40. App. 1. Nurse O'Malley wrote that she had reviewed an autopsy report, lab reports, and medical records "regarding Mr. Bradford" (sic). C.R. 42; R.R. IV, X-1.

The remainder of Nurse O'Malley's report stated:

Summary:

On 7/25 Ms. Battles a 47yo female entered Valley Baptist Medical Center for a routine cholecystectomy and was admitted to a short stay unit. The procedure was done without incident. The patients (sic) vital signs remained stable throughout the procedure, and in post-operative care. That evening around 5:30 pm the patient started complaining of headaches, nausea, and vomiting. At 6:12 pm the patient exhibited seizure activity. The patient lost consciences (sic), and a code was called. The patient was intubated, given Lovenox, and transferred to the intensive care unit. The patient was taken to CT scan, which showed minimal edema, and no intracranial bleeding. The CT angiogram of the chest showed no pulmonary embolism. The CT scan of the abdomen showed no fluid collection. The patient developed a sub arachnoid and subdural hemorrhage. This caused cerebral edema, hemorrhage, necrosis, herniation at the brain stem area which eventually caused death. The family was aware of her condition and decided that Ms. Battles should be taken off life support. C.R. 42; R.R. IV, X-1; App. 1.

Nurse O'Malley's report made no other comment about the care provided to Ms. Battles. C.R. 42; R.R. IV, X-1; App. 1.

VBMC filed objections to Nurse O'Malley's report and a motion to dismiss.

C.R. 35. Appellees filed no response to VBMC's motion to dismiss. The trial court found that the report was deficient and granted a thirty day extension to cure the deficiencies. C.R. 51-52; App. 2.

On February 7, 2014, appellees provided another report from Nurse O'Malley. C.R. 65; R.R. IV, X-2. This second report added a section titled "Findings," but even this second report conceded "I cannot fully say that the standard of care concerning the care of Mrs. Battles was breached." C.R. 65; R.R. IV, X-2.

On March 12, 2014, VBMC filed objections to this second report and again urged a motion to dismiss. C.R. 53. Appellees responded by arguing that VBMC's objections to the second report were untimely. C.R. 67.

As of December 3, 2014, the trial court had not yet ruled, and a status hearing was held on the motion to dismiss. R.R. III, 5. At that hearing, the court invited further arguments on the motion to dismiss. R.R. III, 7. VBMC argued that Nurse O'Malley's first report was "no report," and the case should be dismissed on that basis. R.R. III, 8-11. On December 10, 2014, the trial court denied VBMC's second objections and motion to dismiss. C.R. 75; App. 3.

## SUMMARY OF THE ARGUMENT

This appeal concerns the trial court's abuse of discretion with regard to Nurse O'Malley's first report and VBMC's first motion to dismiss. Because Nurse O'Malley's first report was "no report," the trial court had no discretion to grant an extension of time to cure the report, but rather was obligated to grant the first motion to dismiss. The court's erroneous extension does not cure this abuse of discretion, and the timeliness of VBMC's second motion to dismiss is a moot issue.

Texas law distinguishes between deficient expert reports and purported reports that are really no report at all. A thirty day extension may be granted to cure a deficient report, but when the purported report is "no report," then no extension is permitted and the trial court has no option but to grant a motion to dismiss. Because Nurse O'Malley's first report never asserted VBMC did anything wrong, did not implicate the conduct of any agent of VBMC, and gave no indication that appellees' claim had merit, it was "no report" and the trial court was required to grant the motion to dismiss rather than allow a thirty day extension.

## ARGUMENT

### A.  When the purported report is "no report," no extension is permitted and the trial court must dismiss.

A document qualifies as an expert report only if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 549

1

(Tex. 2011), App. 4. An extension to cure deficiencies in a report may only be granted if the report contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. *Id.* at 557, App. 4. A document that fails to address the statutorily mandated elements set forth in Chapter 74 constitutes no expert report at all. *Ogletree v. Matthews*, 262 S.W.3d 316, 323 (Tex. 2007) (Willett, J., concurring).

If no expert report is timely served, the denial of a motion to dismiss is appealable, even if the court grants an extension. *Scoresby*, 346 S.W.3d at 555; *citing Badiga v. Lopez*, 253 S.W.3d 204, 207-08 (Tex. 2008). The Medical Liability Act does not authorize an extension if no report is timely served. *Scoresby*, 346 S.W.3d at 555; *Haskell v. Seven Acres Jewish Senior Care Servs., Inc.*, 363 S.W.3d 754, 761 (Tex. App.–Houston [1st Dist.] 2012, no pet.). Granting an extension not authorized by section 74.351 does not preclude an appeal. *Scoresby*, 346 S.W.3d at 555, App. 4.

If the document never asserts that anyone did anything wrong, it cannot receive an extension. *Laredo Tex. Hosp. Co., L.P. v. Gonzalez*, 363 S.W.3d 255, 258 (Tex. App.–San Antonio 2012, no pet.) *quoting Scoresby*, 346 S.W.3d at 558 (Willet, J., concurring). If the trial court responds to a motion to dismiss by erroneously granting an extension, the defendant may appeal after the denial of a second motion to dismiss. *See Laredo Tex. Hosp.*, 363 S.W.3d at 258-59 (erroneous extension was not

2

immediately appealable, but appellate court ordered dismissal on appeal after denial of second motion to dismiss because initial report was "no report"); *cf. Avila v. Jimenez*, No. 13-13-00101-CV, 2013 WL 1500328 at *2-3 (Tex. App.–Corpus Christi 2013, pet. denied) (extension was granted, second motion dismiss was denied and appeal then taken; court considered contention that pre-extension report was "no report").

A report that does not implicate the conduct of a defendant does not constitute an expert report as to that defendant. *Reddy v. Hebner*, 435 S.W.3d 323, 328 (Tex. App.–Austin 2014, pet. filed); *Sinha v. Thurston*, 373 S.W.3d 795, 800 (Tex. App.–Houston [14th Dist.] 2012, no pet.). When the purported report does not constitute an expert report as to a defendant, the trial court does not have any discretion to deny the defendant's motion to dismiss. *Id.*

The 21-day deadline for objecting to the sufficiency of an expert report is only triggered if the report implicates the defendant. *Reddy*, 435 S.W.3d at 328. If what the plaintiff provides is "no report," then the defendant's obligation to object to the report is never triggered. *Haskell*, 363 S.W.3d at 761.

**B.    Nurse O'Malley's first report stated no opinions and was "no report."**

Nurse O'Malley's first report was the kind of document that is "no report." The report simply described events during Ms. Battles's stay at VBMC, without comment on what should or should not have been done during the course of her care. C.R. 42;

3

R.R. IV, X-1; App. 1.

The only portion of the report that addresses Ms. Battles's care, the "Summary," begins by noting that a cholecystectomy was performed without incident, and the patient's vital signs remained stable throughout the procedure and in post-operative care. C.R. 42; R.R. IV, X-1; App. 1.

It then notes that around 5:30 pm the patient started complaining of headaches, nausea, and vomiting. C.R. 42; R.R. IV, X-1; App. 1. The report does not say that any misconduct by VBMC was responsible for the headaches, nausea, and vomiting, nor does it say what VBMC should have done, or should not have done, in response to these symptoms. C.R. 42; R.R. IV, X-1; App. 1.

Next the report says at 6:12 pm the patient exhibited seizure activity, but, again, the report does not say that any misconduct by VBMC was responsible for the seizure activity, nor does it say what VBMC should have done, or should not have done, in response to this seizure activity. C.R. 42; R.R. IV, X-1; App. 1.

Next the report says the patient was taken for CT scans, but the CT scans showed no problems. C.R. 42; R.R. IV, X-1; App. 1. The report makes no comment about whether it was appropriate to conduct the CT scans, or what, if anything, should have been done in response to the results of the CT scans.

The report concludes by saying the patient developed a sub arachnoid and subdural hemorrhage, which caused cerebral edema, hemorrhage, necrosis, herniation

at the brain stem and, eventually death.  C.R. 42; R.R. IV, X-1; App. 1.  Again the report does not say any acts or omissions by VBMC were responsible for any of these conditions, nor does it fault anything VBMC did or failed to do in response to these conditions.  C.R. 42; R.R. IV, X-1; App. 1.

At no point does the report offer any commentary or opinions about the appropriateness of the care provided by VBMC.  Indeed, the report does not even identify any care that was (or should have been) provided by VBMC's agents rather than by others whom VBMC does not control and for whom VBMC does not have vicarious liability, such as physicians.  C.R. 42; R.R. IV, X-1; App. 1.  Nowhere does the report state, directly or indirectly, that appellees' claims have merit.

**C.    Caselaw demonstrates the trial court was obligated to grant VBMC's first motion to dismiss.**

The Medical Liability Act does not suggest that a document utterly devoid of substantive content will qualify as an expert report. *Scoresby v. Santillan*, 346 S.W.3d at 549, App. 4.  Nurse O'Malley's first report is the kind of document that is "no report" because it does not contain a statement of opinion indicating that the claim asserted by the plaintiff against the defendant has merit.  *Id.*  If the purported report is this kind of "no report," then the trial court has no discretion to grant an extension of time to cure deficiencies in the report, but rather, the trial court is obligated to grant the initial motion to dismiss.  *Id.* at 557; *Haskell*, 363 S.W.3d at 761.

Several cases have held that reports like Nurse O'Malley's first report are "no

5

report," and the trial court cannot grant an extension but must grant a motion to dismiss such a report.

In *Velandia v. Contreras*, 359 S.W.3d 674 Tex. App.–Houston [14th Dist.] 2011, no pet.) the purported report failed to include any opinion that the claim had merit. *Id*. at 678. Nor did the report offer the applicable standard of care or an explanation of how the defendant failed to meet any standard of care. *Id*. at 678-79. The report also failed to identify a causal relationship between any failure by the defendant and the plaintiff's injury, harm, or damages. *Id*. at 679. The court concluded the purported report was not an expert report, and the trial court had abused its discretion in denying the motion to dismiss. *Id*. In our case, Nurse O'Malley's report has the same problems - it does not describe the standard of care applicable to VBMC, does not identify any breach of any such standard, does not explain how any such breach caused the injuries complained of, and does not include an opinion that the claim has merit. C.R. 42; R.R. IV, X-1.

Also instructive is *Haskell v. Seven Acres Jewish Senior Care Services, Inc.*, 363 S.W.3d 754, (Tex. App.–Houston [1st Dist.] 2012, no pet.). In that case, the plaintiff provided letters from three doctors which "describe actions taken by Seven Acres that form the basis of Haskell's suit." 363 S.W.3d at 760. However, "none claims that those actions were malpractice that caused Haskell an injury." *Id*. Furthermore, while each doctor described harm suffered by Haskell, "none of them

6

ties this alleged injury to any wrongful action by Seven Acres." *Id.* The court added "[m]ost significantly, there is nothing in Haskell's report regarding any failure by Seven Acres to meet the applicable standard of care." *Id.*

Similarly in our case, Nurse O'Malley's report describes some actions taken at VBMC, but does not claim those actions were malpractice that caused Battles an injury. C.R. 42; R.R. IV, X-1. Although O'Malley's report notes that Battles died, the report does not in any way tie this injury to any wrongful action by VBMC. C.R. 42; R.R. IV, X-1. Also, as in *Haskell*, O'Malley's report says nothing about VBMC failing to meet the applicable standard of care. C.R. 42; R.R. IV, X-1.

In *Laredo Tex. Hospital Co., L.P. v. Gonzalez*, 363 S.W.3d 255 (Tex. App.–San Antonio 2012, no pet.) the plaintiff obtained a report from a doctor stating that insertion of an intravenous catheter led to the patient's injuries, but the report does not identify who performed this procedure. *Id*. at 258. Furthermore, the report "never attempts to state the applicable standard of care, how any defendant failed to meet that standard, or even if a failure in the standard of care occurred." *Id*. at 258. The court held this report was "no report" and therefore extension of time to cure deficiencies was improper and dismissal was mandatory. *Id*. at 258-59.

In *San Antonio Extended Medical Care, Inc. v. Vasquez*, 358 S.W.3d 685, 690 (Tex. App.–San Antonio 2011, pet. denied) the purported report identified defendant Med Mart as a party that was to deliver medical supplies but otherwise did not identify

7

the standard of care, and was silent on how Med Mart failed to meet the standard of care or how that shortcoming caused Vasquez's death. *Id*. at 690. Also, the purported report did not provide an opinion regarding whether Vasquez's claims had merit. *Id*. The court concluded the purported report did not meet the standard for an "expert report" and dismissal was mandatory. *Id*. at 691.

Finally, in *Fung v. Fischer*, 365 S.W.3d 507, 530, 536 (Tex. App.–Austin 2012, no pet.) the court noted that the purported report does provide information about Fung's standard of care as a primary care physician, does not allege any breach of the standard of care by Fung, nor any causal link between an alleged breach by Fung and plaintiff's injury. *Id*. at 536. The court concluded the purported report "simply fails to assert that Fung did anything wrong" and was "no report" as to Fung. *Id*. Therefore, the report was ineligible for the statutory extension and Fung was entitled to dismissal. *Id*.

Nurse O'Malley's report contains the same glaring flaws - no statement of the standard of care as to VBMC, no statement of how any such standard was breached, no statement of how any such breach caused Ms. Battles' death, and, fundamentally, no statement that VBMC did anything wrong or that appellees' claims against VBMC have any merit. C.R. 42; R.R. IV, X-1.

## CONCLUSION AND PRAYER

Because Nurse O'Malley's report was "no report," the trial court had no

8

discretion to take any action but dismissal. The trial court was not authorized to grant the thirty day extension that it did, and the timeliness of VBMC's second motion to dismiss is irrelevant, because the trial court was obligated to grant the first motion to dismiss, and VBMC is entitled to take an appeal from the trial court's abuse of discretion with regard to the first motion to dismiss. *Scoresby*, 346 S.W.3d at 555; *Laredo Tex. Hosp.*, 363 S.W.3d at 258-259.

WHEREFORE, appellant Valley Baptist Medical Center prays that this Court render judgment dismissing appellees' claims with prejudice, and for all other relief to which it is entitled.

Respectfully submitted,

**ADAMS & GRAHAM, L.L.P.**
P.O. Drawer 1429
Harlingen, Texas 78551-1429
Telephone: (956) 428-7495
Facsimile: (956) 428-2954


By: /s/ *Scott T. Clark*
Scott T. Clark
State Bar No. 00795896
sclark@adamsgraham.com
Roger W. Hughes
State Bar No. 10229500
rhughes@adamsgraham.com
Will Hughes
State Bar No. 10240100
willhughes@adamsgraham.com

COUNSEL FOR APPELLANT, VALLEY
BAPTIST MEDICAL CENTER

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. P. 9.4(i)(3), the undersigned certifies this Appellant's Brief complies with the type-volume limitations of Tex. R. App. P. 9.4(i)(2)(D).

Exclusive of the exempted portions in Tex. R. App. P. 9(i)(1), Appellant's Brief contains  2,191  words.  Appellant's Brief has been prepared in proportionally spaced typeface using:

Software Name and Version:   WordPerfect X5 for Windows

in (Typeface Name and Font Size):   New Times Roman 14 point   .

ADAMS & GRAHAM, L.L.P.
P. O. Drawer 1429
Harlingen, TX 78551-1429
956/428-7495; FAX: 956/428-2954
sclark@adamsgraham.com


By:     /s/     *Scott T. Clark*
        SCOTT T. CLARK
        State Bar No. 00795896

Attorney for Appellant

10

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was forwarded to the following counsel of record on this the 2nd day of March, 2015:

Attorneys of record for *Appellees* BATTLES, ET AL.:

Mr. Robert Garza                                                    *Via e-service*
Myles R. Garza                                                         *& e-mail*
**LAW OFFICE OF ROBERT GARZA, P.C.**
1200 E. Harrison Street
Brownsville, Texas 78520

                        /s/    *Scott T. Clark*
                        SCOTT T. CLARK

# APPENDICES


1.      Erin K. O'Malley, RN, BSN, MHSA, INC-CSp.'s report dated November 11, 2013.

2.      Order Granting Defendant Valley Baptist Medical Center's Objections to Plaintiffs' Expert Report of Erin K. O'Malley, RN, BSN, MHSA, INC-CSP and Granting Plaintiffs A CPRC§74.351(c) Extension to Furnish Compliant Report signed January 8, 2014.

3.      Order on VBMC's Objections to Plaintiff's Second Deficient Expert Report of Erin K. O'Malley, RN, BSN, MHSA, INC-CSP and Motion to Dismiss signed December 10, 2014.

4.      *Scoresby v. Santillan*, 346 S.W.3d 546 (Tex. 2011)

Cause No. 13-14-00756-CV

# APPENDIX 1

TO APPELLANT'S BRIEF

EKO Consulting

Erin K. O'Malley, RN, BSN, MHSA, INC-CSp.

2907 Ashwood St

Houston, TX 77025

November 11th, 2013

Law Offices of Robert Garza, PC

Retired State District Judge

2320 Central Blvd

Brownsville, Texas 78520



DEFENDANT'S
EXHIBIT
1

Re: Battles vs. Valley Baptist Medical Center

Dear Mr. Garza:

You have asked me for my opinion on the standards of care, breaches of said standards, and the basis of same in the case of Battles vs Valley Baptist Medical Center.

I am a registered nurse in the state of Texas since December 1991, and have over twenty-two years of clinical experience, which include: emergency medicine, critical care, wound care, hyperbaric medicine, outpatient clinical management, and hospital administration. I have over fifteen years experience in wound care practice and clinical management. I obtained a Bachelors Degree in Nursing from Texas Woman's University in 1991, a Masters Degree in Health Services Administration from Southwest University in 2001, and a Masters in Business Administration from Texas Women's University in 2008. I have cared for numerous patients requiring intensive care treatment. My experience includes the following:

1991-1993    Staff Nurse Emergency Room at Memorial Hermann-TMC. Houston TX.

1993-1996    Relief Charge Nurse Shock Trauma ICU at Memorial Hermann-TMC. Houston TX.

1996-1999    Clinical Nurse Coordinator for Department of Hyperbarics, Wound Care and Lymphedema at Memorial Hermann Hospital, Houston, TX.

1999-2000    Clinical Manager of the University of Texas Outpatient Clinic at Memorial Hermann Hospital, Houston, TX

2000-2001    Curative Healthcare Services – contract wound care management and pharmaceutical company which manages wound care operations in acute care hospitals.

2001-2003    Chief Nursing Officer III of 110 bed long term acute care facility with Kindred Healthcare, Inc. in Houston, TX.

2003-2004    Associate Administrator at Cornerstone Hospitals of Austin, a long term acute care hospital in Austin, TX.

2005-2006    Director of Education for Spring Branch Medical Center responsible for all training, educational and orientation programs of acute medical and surgical patients.

2006-2008    Clinical Operations Manager of Hyperbaric, Wound Care and Lymphedema unit at Memorial Hermann Hospital in Houston, TX.

2008-2010    Director of Outpatient Services and Neurosciences at Memorial Hermann Hospital in Houston, TX

2010-2012    Chief Clinical Officer of Kindred Hospital North, long term acute care hospital including nursing, wound care, outpatient services.

2012- Present  Clinical Practice Manger and Head Research Nurse, Baylor College of Medicine.

This report has been rendered in a professional, diligent manner, and is based on the facts obtained from the materials provided to me, as well as my education, training and clinical expertise in general nursing care. This report is intended to be a fair summary of my opinions.

I have reviewed the following records provided by your office regarding Mr. Bradford:

- Autopsy Report

- **Lab Reports**

- Medical Records from Valley Baptist Medical Center

Summary:

On 7/25 Ms. Battles a 47yo female entered Valley Baptist Medical Center for a routine cholecystectomy and was admitted to a short stay unit. The procedure was done without incidence. The patients vital signs remained stable throughout the procedure, and in post-operative care. That evening around 5:30 pm the patient started complaining of headaches, nausea, and vomiting. At 6:12 pm the patient exhibited seizure activity. The patient lost consciences, and a code was called. The patient was intubated, given Lovenox, and transferred to the intensive care unit. The patient was taken to CT scan, which showed minimal edema, and no intracranial bleeding. The CT angiogram of the chest showed no pulmonary embolism. The CT scan of the abdomen showed no fluid collection. The patient developed a sub arachnoid and subdural hemorrhage. This caused cerebral edema, hemorrhage, necrosis, herniation at the brain stem area which eventually caused death. The family was aware of her condition and decided that Ms. Battles should be taken off life support.

Cause No. 13-14-00756-CV

# APPENDIX 2

TO A<small>PPELLANT'S</small> B<small>RIEF</small>

CAUSE NO. 2013-DCL-04983-H

| ROSALINDA BATTLES, GERALD | : | IN THE DISTRICT COURT |
| BATTLES, AS SURVIVING SPOUSE | : | |
| OF ROSALINDA BATTLES, AMANDA | : | |
| GISELLE BATTLES, AS SURVIVING | : | |
| CHILD OF ROSALINDA BATTLES | : | |
| AND JEREMY BLAKE BATTLES, AS | : | |
| SURVIVING CHILD OF ROSALINDA | : | |
| BATTLES | : | |
| | : | |
| vs. | : | 444th JUDICIAL DISTRICT |
| | : | |
| VALLEY BAPTIST MEDICAL CENTER | : | OF CAMERON COUNTY, TEXAS |

---

**ORDER GRANTING DEFENDANT VALLEY BAPTIST MEDICAL CENTER-BROWNSVILLE'S OBJECTIONS TO PLAINTIFFS' EXPERT REPORT OF ERIN K. O'MALLEY, RN, BSN, MHSA, INC-CSP AND GRANTING PLAINTIFFS A CPRC§74.351(c) EXTENSION TO FURNISH COMPLIANT REPORT**

---

CAME ON FOR CONSIDERATION, defendant Valley Baptist Medical Center-Brownsville's Objections to Plaintiffs' Expert Report of Erin K. O'Malley, RN, BSN, MHSA, INC-CSp and the Court having heard the evidence submitted in connection with the Objections of the opinion that said Objections should be sustained because the Court finds that elements of the report are deficient and that the plaintiffs should have one 30-day extension to cure such deficiencies; and accordingly;

IT IS THEREFORE ORDERED that defendant Valley Baptist Medical Center-Brownsville's Objections to Plaintiffs' Expert Report of Erin K. O'Malley, RN, BSN, MHSA, INC-CSp are hereby sustained; and

IT IS FURTHER ORDERED that plaintiffs are granted a 30-day extension to cure the deficiencies in their expert report.

51

PDF created with pdfFactory Pro trial version www.pdffactory.com

SIGNED FOR ENTRY this ___ day of _____, 201__.

_____
JUDGE PRESIDING


Copies to: 1/9/14

Robert Garza, LAW OFFICE OF ROBERT GARZA, P.C., 2320 Central Blvd., Brownsville, TX 78520; Fax No. 956-544-1108; email:jrobert@rgarzalaw.com
Will Hughes, ADAMS & GRAHAM, L.L.P., P. O. Drawer 1429, Harlingen, TX 78551-1429; Fax No. 956-428-2954; e-mail:willhughes@adamsgraham.com

FILED 11:00 O'CLOCK A M
AURORA DE LA GARZA, CLERK

JAN 0 8 2014

DISTRICT COURT OF CAMERON COUNTY, TEXAS
_____ DEPUTY

52

PDF created with pdfFactory Pro trial version www.pdffactory.com

Cause No. 13-14-00756-CV

# APPENDIX 3

TO APPELLANT'S BRIEF

| | | |
|---|---|---|
| ROSALINDA BATTLES, GERALD | § | IN THE DISTRICT COURT |
| BATTLES, AS SURVIVING SPOUSE | § | |
| OF ROSALINDA BATTLES, AMANDA | § | |
| GISELLE BATTLES, AS SURVIVING | § | |
| CHILD OF ROSALINDA BATTLES | § | |
| AND JEREMY BLAKE BATTLES, AS | § | |
| SURVIVING CHILD OF ROSALINDA | § | |
| BATTLES | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | 444TH JUDICIAL DISTRICT |
| | § | |
| VALLEY BAPTIST MEDICAL | § | |
| CENTER | § | |
| Defendant. | § | OF CAMERON COUNTY, TEXAS |

## ORDER ON DEFENDANT VALLEY BAPTIST MEDICAL CENTER – BROWNSVILLE'S OBJECTIONS TO PLAINTIFF'S SECOND DEFICIENT EXPERT REPORT OF ERIN K. O'MALLEY, RN, BSN, MHSA, INC-CSP AND MOTION TO DISMISS

On _____, a hearing was held on the Defendant Valley Baptist Medical Center – Brownsville's Objections to Plaintiff's Second Deficient Expert Report of Erin K. O'Malley, RN, BSN, MHSA, INC-CSP and Motion to Dismiss in the above-styled and numbered cause. After considering the arguments of the parties, the court is of the opinion that said motion should be **DENIED.**

**IT IS THEREFORE ORDERED** that Defendant Valley Baptist Medical Center – Brownsville's Objections to Plaintiff's Second Deficient Expert Report of Erin K. O'Malley, RN, BSN, MHSA, INC-CSP and Motion to Dismiss is hereby **DENIED.**

SIGNED on this 10 day of _December_ 2014.

FILED ___ O'CLOCK ___ M
AURORA DE LA GARZA, CLERK

DEC 10 2014

DISTRICT COURT OF CAMERON COUNTY, TEXAS

_____ DEPUTY

_____
JUDGE PRESIDING

75

PDF created with pdfFactory Pro trial version www.pdffactory.com

Cause No. 13-14-00756-CV

# APPENDIX 4

TO APPELLANT'S BRIEF

We reverse the court of appeals' judgment and render judgment for BIC.

Justice GREEN did not participate in the decision.



---

**Tyler SCORESBY, M.D., Petitioner,**

v.

**Catarino SANTILLAN, Individually and As Next Friend of Samuel Santillan, A Minor, Respondent.**

No. 09–0497.

Supreme Court of Texas.

Argued Nov. 9, 2010.

Decided July 1, 2011.

Rehearing Denied Sept. 30, 2011.

**Background:** Patient brought action against physicians under Medical Liability Act. The 96th District Court, Tarrant County, Jeff Walker, J., denied physicians' motions to dismiss for failure to file compliant health care expert report, and granted patient 30-day extension to cure deficiencies in report. Both physicians appealed. On consolidated appeal, the Fort Worth Court of Appeals, Bill Meier, J., 287 S.W.3d 319, dismissed the appeals. Physicians appealed.

**Holdings:** The Supreme Court, Hecht, J., held that:

(1) trial court should err on side of granting plaintiff additional 30 days in which to cure deficiency in expert report, and defendant cannot seek review of this ruling or appeal court's concomitant refusal to dismiss claim before 30 day period has expired;

(2) document qualifies as "expert report" under Medical Liability Act if it contains statement of opinion by individual with expertise indicating that claim asserted by plaintiff has merit;

(3) 30 day extension to cure deficiencies in expert report may be granted if report is served by statutory deadline and contains opinion of individual with expertise that claim has merit;

(4) doctor's expert report was deficient because it did not state standard of care; and

(5) doctor's expert report, although deficient, was not the legal equivalent of "no report" at all under Act.

Affirmed.

Willett, J., filed concurring opinion.

Johnson, J., dissented and filed opinion in which Wainwright, J., joined.

**1. Health ⊙⇒804**

Medical Liability Act entitles a defendant to dismissal of a health care liability claim if, within 120 days of the date suit was filed, he is not served with an expert report showing that the claim against him has merit. V.T.C.A., Civil Practice & Remedies Code §§ 74.001–74.507.

**2. Appeal and Error ⊙⇒70(3)**

Trial court's refusal to dismiss health care liability claim when defendant is not served with an expert report within 120 days of the date suit was filed is immediately appealable. V.T.C.A., Civil Practice & Remedies Code §§ 74.001–74.507.

**3. Appeal and Error ⊙⇒70(3)**
**Health ⊙⇒804**

Medical Liability Act sets specific requirements for an adequate expert report and mandates that objective good faith effort be made to comply with them, but it also authorizes the trial court to give a plaintiff who meets the 120–day deadline for serving expert report an additional thirty days in which to cure a "deficiency"

in the elements of the report, and trial court should err on the side of granting the additional time and must grant it if the deficiencies are curable, and defendant cannot seek review of this ruling or appeal the court's concomitant refusal to dismiss the claim before the thirty-day period has expired. V.T.C.A., Civil Practice & Remedies Code §§ 51.014(a)(9), 74.351(a–c, l), (r)(6).

**4. Health ⟨⟩804**

While Medical Liability Act contemplates that a document can be considered an expert report despite its deficiencies, the Act does not suggest that a document utterly devoid of substantive content will qualify as an expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**5. Health ⟨⟩804**

Document qualifies as an "expert report" under Medical Liability Act if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

> See publication Words and Phrases for other judicial constructions and definitions.

**6. Health ⟨⟩804**

Under Medical Liability Act, expert's lack of relevant qualifications and his opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so, and this lenient standard avoids the expense and delay of multiple interlocutory appeals and assures plaintiff a fair opportunity to demonstrate that his claim is not frivolous. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**7. Health ⟨⟩603**

Goal of the Medical Liability and Insurance Improvement Act (MLIIA) and the Medical Liability Act is to make health care more available and less expensive by reducing the cost of health care liability claims, and eliciting an expert's opinions early in the litigation is an obvious place to start in attempting to reduce frivolous lawsuits and thereby reduce the costs of claims. V.T.C.A., Civil Practice & Remedies Code §§ 74.001–74.507; Vernon's Ann.Texas Civ.St. art. 4590i (Repealed).

**8. Health ⟨⟩804**

Purpose of Medical Liability Act's expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**9. Health ⟨⟩804**

Failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report under Medical Liability Act, means that the claim is either frivolous, or at best has been brought prematurely. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

**10. Pretrial Procedure ⟨⟩46**

There are constitutional limitations upon the power of courts to dismiss an action for discovery violations without affording a party the opportunity for a hearing on the merits of his cause, and those limitations constrain the legislature no less in requiring dismissal.

**11. Health ⟨⟩804**

No particular words or formality are required in expert report under Medical Liability Act, but bare conclusions will not suffice, and the report must address all the elements set forth in Act, and omissions may not be supplied by inference. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**12. Health ⬤804**

Medical Liability Act allows a claimant a thirty-day period to cure deficiencies before the trial court finally determines that the report is inadequate and the claim must be dismissed. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

**13. Health ⬤603**

Medical Liability Act's principal purpose is to reduce the expense of health care liability claims. V.T.C.A., Civil Practice & Remedies Code §§ 74.001–74.507.

**14. Health ⬤804**

Goal of the Medical Liability Act's expert report requirement is to deter frivolous claims, and inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

**15. Health ⬤804**

Medical Liability Act's thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

**16. Appeal and Error ⬤70(3)**

Under Medical Liability Act, all deficiencies in expert report, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case. V.T.C.A., Civil Practice & Remedies Code § 74.351(c), (r)(6).

**17. Health ⬤804**

Doctor's expert report was deficient, and thus did not satisfy standards for expert report under Medical Liability Act, because it did not state the standard of care, but, rather, only implied that it was inconsistent with the defendant physicians'

conduct. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

**18. Health ⬤804**

Doctor's expert report, although deficient because it did not state the standard of care, was not the legal equivalent of "no report" at all under Medical Liability Act, given that there was no question that, in doctor's expert opinion, patient's health care liability claim against defendant physicians had merit, and since the report was served within the statutory 120 day deadline, trial court had authority under Act to grant patient an additional 30 days to cure deficiencies in the expert report. V.T.C.A., Civil Practice & Remedies Code § 74.351(a–c).

**19. Appeal and Error ⬤70(3)**
    **Health ⬤804**

Although doctor's expert report was deficient, because it did not state the standard of care, it was possible to cure deficiencies in the expert report, and thus, trial court granted patient an additional 30 days to cure deficiencies in the expert report, and trial court's decision granting patient an additional 30 days to cure deficiencies, and denying the defendant physicians' motions to dismiss patient's health care liability claim, were not appealable before the 30 day period had expired. V.T.C.A., Civil Practice & Remedies Code § 74.351(a–c), (r)(6).

**20. Health ⬤804**

Medical Liability Act requires that expert's knowledge, training or experience, and practice be relevant to patient's claim. V.T.C.A., Civil Practice & Remedies Code § 74.351(r)(6).

---

Eric Rene Reyes, Jason C.N. Smith, Art Brender, Fort Worth, for Catarino Santillan.

Michael Alan Yanof, Philipa Remington, Dallas, for Tyler Scoresby, M.D.

Randy J. Hall, David Leon Pratt II, Fort Worth, for Yadranko Ducic, M.D.

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice MEDINA, Justice GREEN, Justice WILLETT, Justice GUZMAN, and Justice LEHRMANN joined.

[1–3] The Medical Liability Act[1] entitles a defendant to dismissal of a health care liability claim if, within 120 days of the date suit was filed, he is not served with an expert report showing that the claim against him has merit.[2] The trial court's refusal to dismiss is immediately appealable.[3] The Act sets specific requirements for an adequate report[4] and mandates that "an objective good faith effort [be made] to comply" with them,[5] but it also authorizes the trial court to give a plaintiff who meets the 120–day deadline an additional thirty days in which to cure a "deficiency" in the elements of the report.[6] The trial court should err on the side of granting the additional time[7] and must grant it if the deficiencies are curable.[8] The defendant cannot seek review of this ruling[9] or appeal the court's concomitant refusal to dismiss the claim before the thirty-day period has expired.[10]

[4–6] While the Act thus contemplates that a document can be considered an expert report despite its deficiencies, the Act does not suggest that a document utterly devoid of substantive content will qualify as an expert report. Based on the Act's text and stated purposes, we hold that a document qualifies as an expert report if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so. This lenient standard avoids the expense and delay of multiple interlocutory appeals and assures a claimant a fair opportunity to demonstrate that his claim is not frivolous. The expert report before us meets this test, and therefore the trial court's order allowing thirty days to cure deficiencies and denying the defendants' motions to dismiss were not appealable. Accordingly, we affirm the court of appeals' judgment dismissing the appeal for want of jurisdiction.[11]

1. Tex. Civ. Prac. & Rem.Code §§ 74.001–.507. All references to the Act are to these provisions.

2. *Id.* § 74.351(b).

3. *Id.* § 51.014(a)(9); *Badiga v. Lopez,* 274 S.W.3d 681, 685 (Tex.2009).

4. Tex. Civ. Prac. & Rem.Code § 74.351(r)(6).

5. *Id.* § 74.351(*l*).

6. *Id.* § 74.351(c).

7. *Samlowski v. Wooten,* 332 S.W.3d 404, 411 (Tex.2011) (plurality op. of Medina, J., joined by Jefferson, C.J., and Hecht, J.) (" '[T]rial courts should err on the side of granting claimants' extensions to show the merits of their claims.' " (quoting *id.* at 416 (Guzman, J., joined by Lehrmann, J., concurring in the judgment))).

8. *Id.* at 411 (plurality op. of Medina, J., joined by Jefferson, C.J., and Hecht, J.); *id.* at 416 (Guzman, J., joined by Lehrmann, J., concurring in the judgment).

9. Tex. Civ. Prac. & Rem.Code § 51.014(a)(9) (no interlocutory appeal); *In re Watkins,* 279 S.W.3d 633, 634 (Tex.2009) (orig.proceeding) (no review by mandamus).

10. *Ogletree v. Matthews,* 262 S.W.3d 316, 321 (Tex.2007).

11. 287 S.W.3d 319 (Tex.App.-Fort Worth 2009).

I

On behalf of Samuel Santillan, a minor, Catarino Santillan sued Dr. Tyler Scoresby and Dr. Yadranko Ducic, two otolaryngology (ENT) surgeons (collectively, "the Physicians"), alleging that they negligently performed a medial maxillectomy to remove growths from Samuel's sinus cavity. Santillan asserts that an incision made too far into Samuel's brain lacerated a blood vessel and required surgery to stop the bleeding, resulting in brain damage and partial paralysis.

To satisfy the Act's expert report requirement, Santillan timely served the Physicians with a letter from Dr. Charles D. Marable to Santillan's attorney. The letter did not attach Marable's curriculum vitae or describe his credentials or experience other than to state that he is "a Board–Certified neurologist". From having examined Samuel and reviewed his medical records, Marable explained his condition as follows:

> The patient was initially seen on 8/3/07. He is now a 17–year–old Latin–American male who was taken to John Peter Smith on 1/17/06 for a preoperative diagnosis of maxillary sinus neoplasm under the care of Dr. Yadro Ducic, M.D., an ENT physician, and another surgeon, Dr. Tyler Scorsby [sic], with procedures of left mediomaxillectomy [sic], excision of neoplasm of the maxilla, calvarial bone growth and reconstruction of maxilla and excision of tumor of pterygopalatin [sic] structures. During the procedure, an incision was made in the right parietal region in a coronal fashion and carried down the pericranium. As a result of this, there was cortical laceration with active bleeding from several medium size vessels in the area.
>
> According to Dr. Scorsby's [sic] note, the patient awoke in the operating room without complications and was taken to the post anesthesia care unit. However,

on awakening he did not have a normal neurologic exam, in fact, had a right-sided hemiparesis, and due to the progression of his neurological deficit, increasing intercerebral hemorrhage was noted by CT scanning.

> He was taken back to the operating suite on 1/18/06 by Dr. Gregory Smith, D.O., a neurosurgeon. Dr. Smith's preoperative diagnosis was that of expanding inter-cerebral hematoma, status post split thickness skull harvesting, with postoperative diagnosis of expanding intercerebral hematoma and intercerebral hematoma skull perforation. Procedure performed was that of a left parietal craniotomy with evacuation of intercerebral hematoma, repair and hemostasis. Dr. Smith's operative report states there was cortical laceration with active bleeding from several medium-sized vessels in the left parietal area, which were then cauterized with bipolar cautery for hemostatis. An underlying intercerebral hematoma was entered and eventually evacuated successfully with suction.

\* \* \*

> It appears he was in the hospital until 2/11/06, and at that time was transferred to HealthSouth Rehabilitation Hospital, Cityview, admitted on 2/11/06, date of discharge 2/21/06. He was discharged with the diagnosis of left parietal hemorrhage, maxillary sinus tumor resection, right hemiparesis, persistent pain, apraxia, seizure prophylaxis, peptic ulcer prophylaxis and right hemisensory deficit. During his stay at HealthSouth Hospital he progressed in all areas of mobilization and self-care. He was ambulating greater than 400', but still had significant right upper extremity weakness and spasticity. It was then deemed necessary to transfer him to an outpatient brain injury program and work on his strength, cognition and overall mobilization. . . .

He was seen on 8/3/07. He still has weakness of his right arm and leg. Walking seems to still be a problem.... He is still having headaches in the occipital region.

Marable's letter concluded:

As a Board–Certified neurologist, my opinion is that Dr. Ducic violated the standards of care, as well as Dr. Scorsby [sic], and as a result his damages are that of a right-sided hemiparesis with possibility of seizure foci in the future. Although he has not had any seizures, he certainly does meet the criteria for a seizure disorder. Had it not been for Dr. Ducic and Dr. Scorsby's [sic] negligent activity in causing cortical laceration of this patient's left parietal lobe, he would not have needed further hospitalization at John Peter Smith or the ICU therapy, or going to HealthSouth Rehab, and is now left with a right hemiparesis at a young age.

The Physicians each timely objected that the letter was inadequate as an expert report, asserting that: (i) a neurologist is not qualified to testify regarding the standard of care for an ENT surgeon in performing the procedures the Physicians performed on Samuel; (ii) Marable's opinions regarding the Physicians' standard of care, breach, and causal relationship to Samuel's injuries were conclusory and directed to Scoresby and Ducic collectively rather than individually; and (iii) Marable's curriculum vitae was not included, as the Act requires.[12] The Physicians argued Marable's letter was so woefully deficient, it did not even qualify as an expert report under the Act to meet the 120–day deadline. They moved the court to dismiss the case with prejudice and award them their reasonable attorney fees and costs.

After the 120–day deadline, Santillan served the Physicians with Marable's curriculum vitae and his amended report, in which he added that "the applicable standard of care would have been to perform the procedure of a calvaria bone transplant without nicking or lacerating the parietal cortex [and] to get the appropriate surgeon, such as a neurosurgeon, instead of an ENT physician to do a calvaria bone grafting procedure", and that "Dr. Ducic and Dr. Scorsby [sic] ... failed to perform a careful and well-planned surgery, causing a laceration of the cortical hemisphere, causing substantial bleeding". At the hearing on the Physicians' objections and motions, the trial court refused to consider Marable's post-deadline amended report. The Physicians complained that Marable's original letter did not show that he had sufficient qualifications and experience to render an opinion regarding the surgery, and did not define the standard of care, state how it was breached, or explain how a breach resulted in Samuel's injuries. The Physicians acknowledged that Samuel suffered a lacerated artery but argued that such things are inevitable in surgery, no matter how carefully it is performed, and do not necessarily indicate a breach of the standard of care. The trial court denied the motions to dismiss and granted Santillan a thirty-day extension to cure deficiencies in the report.

The Physicians appealed, persisting in their contention that Marable's letter was too inadequate to qualify as an expert report; therefore, Santillan had not met the 120–day deadline; and consequently, the Act did not permit an additional thirty days to cure the deficiencies but instead required that the case be dismissed.[13] The court of appeals construed our analysis in *Ogletree v. Matthews*[14] to mean that defi-

---

**12.**  TEX. CIV. PRAC. & REM.CODE § 74.351(a).

**13.**  287 S.W.3d at 320.

**14.**  262 S.W.3d 316.

ciencies in a document tendered as an expert report will not preclude it from qualifying as such.[15] The court concluded that an interlocutory appeal in these circumstances was not permitted.[16]

We granted the Physicians' petitions for review.[17]

While this appeal has been pending, the Physicians have lodged essentially the same objections to Santillan's amended report as they made to the original report. They have also moved again for dismissal, attorney fees, and costs. The trial court has not ruled on those objections and motions.

## II

The Legislature enacted the Medical Liability and Insurance Improvement Act ("MLIIA") in 1977[18] in response to "a medical malpractice insurance crisis in the State of Texas" that was having "a material adverse effect on the delivery of medical and health care in Texas, including significant reductions of availability of medical and health care services to the people of Texas and a likelihood of further reductions in the future".[19] The Legislature found that the crisis had been created by an "inordinate[ ]" increase in the volume and expense of health care liability claims.[20] Concerned that "the direct cost of medical care to the patient and public of Texas ha[d] materially increased",[21] the

Legislature's purpose in the MLIIA, expressly stated, was to

> reduce excessive frequency and severity of health care liability claims[,] ... decrease the cost of those claims[,] ... do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis[, and thereby] ... make affordable medical and health care more accessible and available to the citizens of Texas.... [22]

In 2003, the Legislature replaced the MLIIA with the Medical Liability Act, repeating its 1977 findings and statements of purpose.[23]

[7] Fundamentally, the goal of the MLIIA and the Medical Liability Act has been to make health care in Texas more available and less expensive by reducing the cost of health care liability claims. To that end, both statutes have sought to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit. "[E]liciting an expert's opinions early in the litigation [is] an obvious place to start in attempting to reduce frivolous lawsuits"[24] and thereby reduce the costs of claims.

The Legislature first added an expert report requirement to the MLIIA in 1993, then strengthened it over the next ten years, finally allowing interlocutory appeals to ensure uniform enforcement. We

---

**15.** 287 S.W.3d at 324.

**16.** *Id.* at 325.

**17.** 53 Tex.Sup.Ct.J. 1061 (Aug. 27, 2010). We have jurisdiction to determine whether the court of appeals had jurisdiction. *Tex. Dep't of Criminal Justice v. Simons,* 140 S.W.3d 338, 343 (Tex.2004).

**18.** Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, formerly TEX.REV.CIV. STAT. ANN. art. 4590i [hereinafter 1977 Act].

**19.** 1977 Act, § 1.02(a)(5)–(6).

**20.** 1977 Act, § 1.02(a)(1)–(5).

**21.** 1977 Act, § 1.02(a)(8).

**22.** 1977 Act, § 1.02(b)(1)–(3), (5).

**23.** Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 10.11, 2003 Tex. Gen. Laws 847, 864–882, 884–885.

**24.** *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001).

look first at the requirement, then the appeal, and finally at their proper operation together.

## A

The 1993 amendment to the MLIIA required a plaintiff, within ninety days of filing suit, either to file an affidavit that he had obtained a suitable expert's opinion that his claim had merit or to post a $2,000 bond or cash deposit.[25] The trial court could extend the deadline for up to ninety days "for good cause shown".[26] A plaintiff who failed to comply risked dismissal without prejudice and liability for costs, again, except for "good cause ... shown".[27]

In 1995, the Legislature required that the expert report itself be filed and raised the amount of the bond or deposit posted in lieu of a report to $5,000.[28] The amendment retained the ninety-day initial deadline but added that even if a bond or deposit were posted, an expert report and curriculum vitae must be filed within 180 days of initiating suit.[29] The amendment specified the qualifications the expert was required to have[30] and defined the report as one "provid[ing] a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."[31] The failure to make "a good faith effort" to comply[32] could result in dismissal with prejudice and liability for attorney fees as well as costs.[33] But if the failure—even missing the deadline completely[34]—was "not intentional or the result of conscious indifference but was the result of an accident or mistake," the trial court was required to grant "a grace period of 30 days to permit the claimant to comply".[35]

The Medical Liability Act, adopted in 2003 and now in effect, eliminates the bond/deposit alternative, shortens the deadline for the expert report and curriculum vitae to 120 days (unless extended by agreement), and requires service rather than filing.[36] The Act retains the definition of an expert report[37] but is more specific about an expert's qualifications.[38]

The Act now distinguishes between missing a deadline altogether and serving an inadequate report. Section 74.351(b) provides that

[i]f, as to a defendant ..., an expert report has not been served [by the deadline], the court, on the motion of the

---

**25.** Act of May 25, 1993, 73rd Leg., R.S., ch. 625, § 3, 1993 Tex. Gen. Laws 2347, 2347, formerly TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(a)–(b) [hereinafter 1993 Act].

**26.** 1993 Act, former art. 4590i, § 13.01(d).

**27.** 1993 Act, former art. 4590i, § 13.01(c).

**28.** Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, formerly TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(a) [hereinafter 1995 Act].

**29.** 1995 Act, former art. 4590i, § 13.01(d).

**30.** 1995 Act, former art. 4590i, §§ 13.01(r)(5) & 14.01.

**31.** 1995 Act, former art. 4590i, § 13.01(r)(6).

**32.** 1995 Act, former art. 4590i, § 13.01(*l*).

**33.** 1995 Act, former art. 4590i, § 13.01(e).

**34.** *Stockton v. Offenbach*, 336 S.W.3d 610, 616 (Tex.2011) ("Under article 4590i, a plaintiff could obtain an extension, even when no report was provided by the deadline, if the plaintiff could show an 'accident or mistake' in failing to furnish a timely report.").

**35.** 1995 Act, former art. 4590i, § 13.01(g).

**36.** TEX. CIV. PRAC. & REM.CODE § 74.351(a).

**37.** *Id.* § 74.351(r)(6).

**38.** *Id.* §§ 74.351(r)(5), 74.401–.403.

[defendant], shall, subject to Subsection (c), enter an order that:

> (1) awards [the defendant] reasonable attorney's fees and costs of court . . .; and
>
> (2) dismisses the claim with respect to the [defendant] with prejudice to the refiling of the claim.[39]

Under section 74.351(*l*), the same consequences attend serving an inadequate report that "does not represent an objective good faith effort" to comply with the Act's requirements.[40] But before those consequences are imposed, the Act provides an opportunity for deficiencies to be cured. Section 74.351(a) requires that any objection to the sufficiency of a report be lodged within twenty-one days of service,[41] and section 74.351(c) provides:

> If an expert report has not been served [by the deadline] because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency."[42]

[8–10] The Act's thirty-day extension to cure deficiencies replaces the 1995 law's thirty-day "grace period" for "accident or mistake", shifting the focus from the claimant's conduct to the report's contents. But the importance of an appropriate delay in finally dismissing a claim for want of an adequate report is undiminished. The purpose of the expert report requirement is to deter frivolous claims,[43] not to dispose of claims regardless of their merits. "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely."[44] But the Legislature has likewise recognized that when an expert report can be cured in thirty days, the claim is not frivolous. It must be remembered that " '[t]here are constitutional limitations upon the power of courts . . . to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause' ",[45] and those limitations constrain the Legislature no less in requiring dismissal.

For these reasons, we have held that trial courts should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period. This "minimal delay before a report's sufficiency may again be challenged and the case dismissed, if warranted"[46] does not impair the purpose of the Act.

## B

Under the MLIIA, there was no interlocutory appeal from the denial of a motion

---

**39.** *Id.* § 74.351(b).

**40.** *Id.* § 74.351(*l* ).

**41.** *Id.* § 74.351(a).

**42.** Tex. Civ. Prac. & Rem.Code § 74.351(c).

**43.** *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) ("And one purpose of the expert-report requirement is to deter frivolous claims.").

**44.** *Id.*

**45.** *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991) (quoting *Societe Internationale v. Rogers,* 357 U.S. 197,

209–210, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), citing *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 350–351, 29 S.Ct. 370, 53 L.Ed. 530 (1909), and *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897); *accord Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 705–706, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982)); *see also Walker v. Gutierrez,* 111 S.W.3d 56, 66 (Tex.2003).

**46.** *Ogletree v. Matthews,* 262 S.W.3d 316, 321 (Tex.2007).

to dismiss a health care liability claim for failure to comply with the expert report requirement, and we did not make clear until 2008 that review by mandamus was available.[47] In adopting the Medical Liability Act in 2003, the Legislature permitted an interlocutory appeal from an order denying "all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351".[48] In a series of cases, we have explained the limits of this review mechanism.

If an expert report is timely served, even without a curriculum vitae, we held in *Ogletree v. Matthews* that the trial court's denial of a motion to dismiss, asserting the report's inadequacy, cannot be appealed if the court also grants a thirty-day extension to cure deficiencies.[49] "This prohibition," we said, "is both logical and practical."[50] Otherwise,

> the court of appeals would address the report's sufficiency while its deficiencies were presumably being cured at the trial court level, an illogical and wasteful result. Moreover, because the Legislature authorized a single, thirty day extension for deficient reports, health care providers face only a minimal delay before a report's sufficiency may again be challenged and the case dismissed, if warranted.[51]

If after an extension has been granted, the defendant again moves to dismiss, we held in *Lewis v. Funderburk* that a denial of the motion is appealable.[52]

If no expert report is timely served, we held in *Badiga v. Lopez* that the denial of a motion to dismiss is appealable, even if the court grants an extension.[53] The Medical Liability Act, unlike the MLIIA, does not authorize an extension if no report is timely served. Granting an extension not authorized by section 74.351 does not preclude appeal. But because an appeal is available, we held in *In re Watkins* that review by mandamus is not available.[54]

The present case requires us to determine whether a document served on a defendant can be so lacking in substance that it does not qualify as an expert report, and therefore an immediate appeal from the denial of a motion to dismiss is available under *Badiga*.

## C

[11]  The Act defines an expert report to be

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.[55]

The qualifications and experience necessary for an expert are prescribed in great detail.[56] The adequacy of a report is determined by whether it "represent[s] an objective good faith effort to comply" with

---

**47.** *In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461–462 (Tex.2008).

**48.** Tex. Civ. Prac. & Rem.Code § 51.014(a)(9); Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 1.03, 2003 Tex. Gen. Laws 847, 849.

**49.** 262 S.W.3d at 321.

**50.** *Id.*

**51.** *Id.*

**52.** 253 S.W.3d 204, 207–208 (Tex.2008).

**53.** 274 S.W.3d 681, 685 (Tex.2009).

**54.** 279 S.W.3d 633, 634 (Tex.2009).

**55.** Tex. Civ. Prac. & Rem.Code § 74.351(r)(6).

**56.** *Id.* §§ 74.351(r)(5), 74.401–.403.

the statutory definition.[57] As we have explained:

> In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit.[58]

No particular words [59] or formality [60] are required, but bare conclusions will not suffice.[61] The report must address all the elements,[62] and omissions may not be supplied by inference.[63]

[12] But as we have seen, the Act allows a claimant a thirty-day period to cure deficiencies before the trial court finally determines that the report is inadequate and the claim must be dismissed. In *Ogletree*, we rejected the argument that a deficient report is no report.[64] There, the claimant provided the opinion of a radiologist, without a curriculum vitae, on a urologist's standard of care.[65] Dr. Ogletree argued that the report was really no report at all, but we held that despite its shortcomings, it "implicated Dr. Ogletree's conduct", so that the trial court was authorized to grant a thirty-day extension, and an appeal was prohibited.[66]

[13, 14] *Ogletree's* holding, though sound, can be extended only so far. To stretch the meaning of deficient to include a sheet of paper with the two words, "expert report", written on it would mock the Act's requirements. The expert report in *Lewis* was substantively no more than that—one physician's thank-you letter to another for referring the patient.[67] In determining where to draw the line, we are guided by two considerations. One is that the Act's principal purpose is to reduce the expense of health care liability claims. The Legislature could reasonably have determined that that purpose is served by an interlocutory appeal from the denial of a motion to dismiss for want of an adequate expert report, but as we observed in *Ogletree*, permitting two such appeals—one before the thirty-day cure period and one after—is simply wasteful. The other consideration is the goal of the Act's expert report requirement: to deter frivolous claims. An inadequate expert report does not indicate a frivolous claim if the report's deficiencies are readily curable.

57. *Id.* § 74.351(*l*).

58. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001).

59. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002) (per curiam) ("[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.'").

60. *Palacios,* 46 S.W.3d at 879 ("The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.").

61. *Id.* ("A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes.").

62. *Id.* ("Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements.").

63. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53 ("[T]he report must include the required information within its four corners.").

64. *Ogletree v. Matthews,* 262 S.W.3d 316, 320–321 (Tex.2007).

65. *Id.* at 318.

66. *Id.* at 321.

67. *Lewis v. Funderburk,* 191 S.W.3d 756, 762–763 (Tex.App.-Waco 2006) (Gray, C.J., dissenting), *rev'd,* 253 S.W.3d 204 (Tex.2008).

[15, 16] We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated. We recognize that this is a minimal standard, but we think it is necessary if multiple interlocutory appeals are to be avoided, and appropriate to give a claimant the opportunity provided by the Act's thirty-day extension to show that a claim has merit. All deficiencies, whether in the expert's opinions or qualifications, are subject to being cured before an appeal may be taken from the trial court's refusal to dismiss the case.

### III

[17–19] Dr. Marable's letter in this case easily meets this standard. Claiming expertise as a neurologist, he described the injury to Samuel's brain, ascribed it to the Physicians' breach of the standards of care, and stated that their breach caused Samuel's partial paralysis and other lingering debilities. As an expert report, Dr. Marable's letter was deficient. For example, it did not state the standard of care but only implied that it was inconsistent with the Physicians' conduct. But there is no question that in his opinion, Santillan's claim against the Physicians has merit.

[20] The dissent argues that Dr. Marable was not qualified to give an opinion about the Physicians' conduct because he is only a neurologist, not a surgeon, and therefore his letter is so deficient it does not qualify as an expert report. The Act requires that Dr. Marable's knowledge, training or experience, and practice be "relevant" to Santillan's claim.[68] We ex-

press no view on the adequacy of Dr. Marable's qualifications; the trial court did not specifically address the matter, and it is premature for us to consider it. But the dissent's arguments, we believe, show the wisdom of our approach in determining what qualifies as an expert report.

The dissent acknowledges that, as in *Ogletree*, a radiologist is qualified to opine on "whether the urologist should have involved radiology-related devices and techniques (the specialty in which the expert was qualified) in treating the patient and whether the failure to do so resulted in injury." [69] In that instance, the dissent contends, there is an "apparent closely-related connection" between radiology and neurology.[70] The dissent sees no such connection between neurology and ENT surgery that damages the brain.[71] But surely a neurologist's expertise is relevant in explaining the connection between the Physicians' injury to blood vessels during surgery and the hemiparesis and weakness Simon suffered. What further relevance that expertise has to Santillan's claim should first be addressed by the trial court. In no event, however, do we think a claimant's opportunity to cure and a defendant's immediate right to appeal should turn on such fine distinctions, either in an expert's qualifications or in his opinions.

This case also demonstrates the difficulty with any more stringent standard. The trial court denied the Physicians' motions to dismiss and ordered that Santillan have a thirty-day extension to cure deficiencies in Dr. Marable's report nearly three years ago. Santillan had already served an amended report, in response to which the Physicians had filed renewed objections

**68.** *See* Tex. Civ. Prac. & Rem.Code § § 74.351(r)(5), 74.401(a), (c).

**69.** *Post* at ——.

**70.** *Id.*

**71.** *Id.*

and again moved to dismiss the case. Now that we have dismissed this appeal for want of jurisdiction, the trial court will rule on the objections to the amended report and the motions to dismiss. Whatever the ruling, another appeal will undoubtedly follow. Our holding today will all but eliminate the first, wasteful appeal. Just as importantly, it will help assure that a claimant, after being apprised of a defendant's objections to an expert report, and having had an opportunity to discuss those objections at a hearing before the trial court, will have a fair opportunity to cure any deficiencies and demonstrate that his claim is not frivolous and should be determined on the merits.

\*     \*     \*

Accordingly, the judgment of the court of appeals dismissing this appeal for want of jurisdiction is

*Affirmed.*

Justice WILLETT filed a concurring opinion.

Justice JOHNSON filed a dissenting opinion, in which Justice WAINWRIGHT joined.

Justice WILLETT, concurring.

Since 2006 we have circled an issue both recurring and elusive: whether any document, even one that never accuses anyone of committing malpractice, suffices to warrant an unreviewable thirty-day extension under Section 74.351(c).[1] Until today, the issue was procedurally (and frustratingly) unreachable and thus unresolvable. Final-

ly it is squarely presented, and I am confident today's decision will brighten the line between deficient-report cases (where an extension is discretionary) and no-report cases (where dismissal is mandatory).

\*     \*     \*

In a trio of concurrences in 2007,[2] 2008,[3] and 2009,[4] I focused on this nagging question: Is there a legal difference between filing nothing and filing something that amounts to nothing? That is, can a filing be so utterly lacking in the required statutory elements as to be no report at all, thus requiring dismissal? I join today's decision, which I read to confirm my consistently stated view: If a document bears zero resemblance to what the statute envisions—more to the point, *if it never asserts that anyone did anything wrong*—it cannot receive an extension.

In *Ogletree v. Matthews,* I described what I naively hoped would be "a rare bird in Texas legal practice"[5]—a plaintiff passing off as a bona fide report a document so facially absurd that, "no matter how charitably viewed, it simply cannot be deemed an 'expert report' at all, even a deficient one."[6] The deficient-or-no-report issue was not present in *Ogletree,* but I noticed it in another then-pending case, *Lewis v. Funderburk,* filed one week before *Ogletree.*[7]

In *Funderburk,* the Court confronted "an actual sighting of this rare bird, a species that in my view merits extinction, not conservation."[8] The "report" in *Funderburk* was a thank-you letter from one

---

1. *See* Tex. Civ. Prac. & Rem.Code § 74.351(c).

2. *Ogletree v. Matthews,* 262 S.W.3d 316, 323 (Tex.2007) (Willett, J., concurring).

3. *Lewis v. Funderburk,* 253 S.W.3d 204, 210 (Tex.2008) (Willett, J., concurring).

4. *In re Watkins,* 279 S.W.3d 633, 636 (Tex. 2009) (Willett, J., concurring).

5. 262 S.W.3d at 324 (Willett, J., concurring).

6. *Id.* at 323.

7. *Funderburk,* 253 S.W.3d at 209 (Willett, J., concurring).

8. *Id.*

doctor to another—a letter that never once in any manner, way, shape, or form accused anyone of malpractice.[9] This thanks-for-your-referral letter was no more a medical-expert report "than a doctor-signed prescription or Christmas card would be," I wrote, adding, "If a report is missed, not just amiss, courts are remiss if they do not dismiss."[10] Alas, the defendant did not raise the "no report" issue, thus foreclosing a merits-based challenge.[11]

Finally came *In re Watkins*, where a plaintiff merely filed a narrative of treatment, something that omitted every statutorily required element and had no apparent relationship to a medical-malpractice case.[12] Like *Funderburk*, this case also had a procedural wrinkle that kept the marquee "no report" vs. "deficient report" issue out of reach.[13] But the rare-bird sightings, I noticed, were becoming more commonplace. And they would proliferate on our docket, I predicted, absent appellate enforcement of the statute's mandato-

ry-dismissal provision [14]—or alternatively, this Court's express adoption of a grace-period test that is indeed gracious, allowing extensions for most everything.

Under the Court's admittedly "lenient standard," [15] the document must merely "[contain] a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit." [16] The line is forgiving but bright: The "report" must actually allege someone committed malpractice. The genesis of this elemental requirement is found in *Ogletree*, where the Court first indicated that the purported report must implicate a provider's conduct.[17] It merits emphasis, however, that today's standard, benevolent as it is, is not satisfied by any medical-related piece of paper; the bar is low but not subterranean. For example, the "report" in *Funderburk* would surely fail even today's lax test. The thank-you letter in that case never mentioned malpractice by anyone,

9. The letter is reproduced in its entirety in Chief Justice Gray's dissent in the court of appeals. *See Lewis v. Funderburk*, 191 S.W.3d 756, 762–63 (Tex.App.-Waco 2006) (Gray, C.J., dissenting), *rev'd*, 253 S.W.3d 204 (Tex.2008).

10. *Funderburk*, 253 S.W.3d at 210–11 (Willett, J., concurring).

11. *Id.* at 208 (majority opinion) ("We do not reach the question addressed in the concurring opinions here because it is not raised. As stated in his reply brief, '[Dr.] Lewis has made it abundantly clear that he is not appealing the trial court's [initial] order (no matter how vehemently he disagrees with it),' but instead is only appealing the order denying his second motion to dismiss.").

12. 279 S.W.3d at 637 (Willett, J., concurring).

13. *Id.* at 634 (majority opinion) ("The separate writings join issue again today on the question whether the item served was a deficient report or no report at all. But here it does not matter. If no report was served, interlocutory appeal was available, so manda-

mus is unnecessary. If the report was merely deficient, then an interlocutory appeal was prohibited, and granting mandamus to review it would subvert the Legislature's limit on such review.") (citations omitted).

14. My sense is that such sightings have indeed grown more prevalent, making Chapter 74 defendants perhaps "identify with the seaside residents of Bodega Bay, besieged by avian attacks," *In re Watkins*, 279 S.W.3d at 637 n. 13 (Willett, J., concurring) (citing THE BIRDS (Universal Pictures 1963)), or else those Arkansans who witnessed the so-called Aflockalypse last New Year's Eve, when thousands of blackbirds and starlings fell mysteriously from the skies.

15. 346 S.W.3d 546, 549.

16. *Id.* at 549.

17. 262 S.W.3d at 321 ("Because *a report that implicated Dr. Ogletree's conduct* was served and the trial court granted an extension, the court of appeals could not reach the merits of the motion to dismiss.") (emphasis added).

even in the most implicit or glancing manner. Again, it is not merely that the letter omitted every required statutory element. Rather, it never even hinted at having any relationship to a malpractice case at all—no mention of a claim or a defendant, much less a claim that "an individual with expertise" indicates "has merit." [18]

* * *

Based on my understanding of the Court's "minimal standard" [19]—requiring that someone with expertise express an opinion that the plaintiff has a meritorious malpractice claim against the defendant—I join the Court's decision.

Justice JOHNSON, joined by Justice WAINWRIGHT, dissenting.

The Court says that a plaintiff who timely files a defective expert report is eligible for an extension of time to cure the report if

> [the report] contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit. An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff should be given an opportunity to cure if it is possible to do so.

346 S.W.3d 546, 549. In my view the Court's standard does not conform to requirements the Legislature imposed in authorizing an extension to cure a deficient report. I respectfully dissent.

A trial court is statutorily authorized to grant an extension to cure elements of an expert report that are found deficient, not to cure a report that substantively is not a report, nor to cure a report from which

elements are absent as opposed to deficient:

> (b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:
>
> > (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and
> >
> > (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.
>
> (c) If an expert report has not been served within the period specified by Subsection
>
> (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency.

TEX. CIV. PRAC. & REM.CODE § 74.351(b), (c); [1] *see In re Watkins,* 279 S.W.3d 633, 634–35 (Tex.2009) (Johnson, J., concurring) ("The definition [of expert report] requires that for a document to qualify as a statutory expert report, it must demonstrate three things: (1) someone with relevant expertise (' "[e]xpert report" means a written report by an expert'), (2) has an opinion ('that provides a fair summary of the *expert's opinions'),* and (3) that the defendant was at fault for failing to meet applicable standards of care and thereby harmed the plaintiff. . . ."). Absent an expert with relevant expertise, I do not see

---

**18.** 346 S.W.3d at 549. The narrative in *In re Watkins* might also fail today's test, as it lacked every required statutory element, though unlike the referral letter in *Funderburk,* it at least mentions (twice) the defendant physician's name.

**19.** *Id.* at 557.

**1.** Further references to the Civil Practice and Remedies Code will be by referring to section numbers unless otherwise indicated.

how there can be an expert report under the statute, because the foundation of an expert report is the requirement that the report be by a qualified expert. "Expert" for purposes of a report means:

 [W]ith respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401....

TEX. CIV. PRAC. & REM.CODE § 74.351(r)(5)(A). Section 74.401 provides specific requirements for an expert to be qualified to provide the section 74.351 report:

 (a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

 (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

 (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

 (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* § 74.401(a). The Court has said that "[a] report by an unqualified expert will sometimes (though not always) reflect a good-faith effort sufficient to justify a 30-day extension." *In re Buster*, 275 S.W.3d 475, 477 (Tex.2008) (per curiam) (citing *Leland v. Brandal*, 257 S.W.3d 204, 208

(Tex.2008)). The Court has recognized that not every doctor is qualified to render an opinion about every aspect of medicine or medical science. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex.2008); *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex.1996) ("[G]iven the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question.").

 The Court's new test apparently allows a report to qualify as a deficient report even if the report demonstrates none of the three requirements of section 74.401(a). The test requires only that the person rendering the opinion have some type of undefined level of expertise. It abandons the requirements that the report show the expert (1) has knowledge of accepted standards of care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (2) qualifies on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *See* TEX. CIV. PRAC. & REM.CODE § 74.401(a)(2), (3). Nor does the test require a showing that the expert is practicing medicine or was doing so when the claim arose. *See id.* § 74.401(a)(1).

 Dr. Marable's report says nothing about his surgical qualifications. The report does not give any facts or information which would qualify him to opine on the standards of care for the type of surgery performed in this case, and he did not attach a CV to the report.[2] The report was written on a letterhead showing that he maintains board certification in neurolo-

2. An amended report by Dr. Marable with a CV attached was filed on the day the defendants' motions to dismiss were heard. The CV was not considered by the trial court, but

 it did not show that Dr. Marable had any training or expertise in the type of surgery involved here.

gy and psychiatry. In his report he makes it clear that he is basing his opinion on his expertise in neurology, not surgery: "As a board certified neurologist, my opinion is that Dr. Ducic violated the standards of care, as well as Dr. Scoresby, and as a result [Santillan's] damages are that of a right-sided hemiparesis with possibility of seizure foci in the future." The neurological expertise on which Dr. Marable relies does not involve surgery. *See* WILSON STEGEMAN, MEDICAL TERMS SIMPLIFIED 106 (1976) (noting that neurologists do not perform surgery); American Academy of Neurology, *Working with Your Doctor,* https://patients.aan.com/go/workingwith yourdoctor (last visited Apr. 18, 2011) ("Neurologists do not perform surgery."). Dr. Marable's report does not claim that he now performs or has in the past performed surgery, much less this particular type of surgery. The report neither claims that he has knowledge of the standard of care for performing the surgery nor that he is qualified on the basis of training or experience to offer an expert opinion on those standards of care. *See* TEX. CIV. PRAC. & REM.CODE 74.401(a)(2), (3). The report does not say that he has participated in, observed, or even read about how to do "procedures of left mediomaxillectomy, excision of neoplasm of the maxilla, calvarial bone growth and reconstruction of maxilla and excision of tumor of pterygopalatin structures," which were the surgical procedures performed by Drs. Scoresby and Ducic.[3] In short, nothing in Dr. Marable's report raises an inference that he is a qualified expert as to this type of surgery, as prescribed by statute, and the report is all that was before the trial court in regard to his qualifications.

In *Ogletree v. Matthews,* we considered a defendant's contention that no statutory expert report had been filed because the report was by a radiologist who was not qualified to express an opinion on the standard of care for a urologist. 262 S.W.3d 316, 319 (Tex.2007). The urologist defendant had performed a urethral catheterization during which the patient suffered bruising and bladder perforation. *Id.* at 317. We held that the radiologist's report was deficient, not absent. *Id.* at 320. But in *Ogletree* the radiologist was opining about whether the urologist should have performed the catheterization under flouroscopic guidance in order to avoid or more timely diagnose the perforation. *Id.* at 318. In that instance, the radiologist was opining about whether the urologist should have involved radiology-related devices and techniques (the specialty in which the expert was qualified) in treating the patient and whether the failure to do so resulted in injury. The matter before us is different from *Ogletree* because there is no apparent closely related connection between the expertise involved in the specialty of neurology and the expertise involved in knowing how to perform, and performing, the surgery performed by Drs. Scoresby and Ducic.

In *McAllen Medical Center,* 275 S.W.3d 458, we considered the validity of a doctor's expert reports in negligent credentialing suits against the medical center. McAllen challenged the adequacy of the reports on the basis that the doctor was not qualified to express opinions as to the credentialing process. *Id.* at 462. We agreed with McAllen and held that the reports were inadequate:

> On this record, the plaintiffs have not established Dr. Brown's qualifications. "The standard of care for a hospital is what an ordinarily prudent hospital

---

3. Santillan's attorney represented during oral argument that he believed Dr. Marable's amended report contained statements by Dr.

Marable that he had seen surgery of this type because he had treated patients after they had the surgery.

would do under the same or similar circumstances." Nothing in the record here shows how Dr. Brown is qualified to address this standard. Nor can we infer that she may have some knowledge or expertise that is not included in the record.

Moreover, "a negligent credentialing claim involves a specialized standard of care" and "the health care industry has developed various guidelines to govern a hospital's credentialing process." Dr. Brown's reports contain no reference to any of those guidelines, or any indication that she has special knowledge, training, or experience regarding this process. Nor was Dr. Brown qualified merely because she is a physician; "given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question."

*Id.* at 463 (citations omitted).

The substance of the issue before us is similar to the issue we decided in *McAllen Medical Center.* Dr. Marable's report indicates that the defendants violated standards of care for the surgery and their negligent activity caused damages to Santillan. But Dr. Marable's report does not show he was qualified under the statute to give such an expert opinion, nor did his opinion about the surgeons' decisions and actions during surgery involve his specialty except to the extent a physician with his specialty would have been involved in post-surgical care and possibly a decision to reoperate.

If Dr. Marable's report had in some manner demonstrated that he was qualified to render an opinion about the standard of care for the surgery involved, then I might agree that his conclusory statements about the defendants having negligently violated applicable standards of care and those negligent activities having caused damages were sufficient to support an extension of time. But the report sets out his opinion as a neurologist, not a physician with surgical expertise. The Legislature did not intend that an expert report could be by a doctor with no demonstrated or inferable experience and training in a practice area who reads medical records and writes a report containing the simplistic indictments in the report here: the defendants negligently lacerated the brain and further surgery was required. *See* TEX. CIV. PRAC. & REM.CODE § 74.401(a).

The Court says that " 'there are constitutional limitations upon the power of courts ... to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.'" 346 S.W.3d at 554 (quoting *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991)). I agree. But the statement does not fit here. First of all, the constitutionality of the statute is not challenged. Second, even if it were, the statutory requirement of a timely report by a qualified expert did not spring upon Santillan without warning. The requirement was in place before the surgery took place in January 2006, while suit was not filed against the defendant doctors and Tarrant County Hospital until January 2008. Santillan had time to find a qualified expert to provide the report required to show his claim had merit, if he could find such an expert.

I would hold that failure to timely serve a report by an expert qualified under the statute is not merely a deficiency in an element of the report, it is a deficiency going to the question of whether the report is competent and is entitled to be given any weight. And I would hold that it is not an expert report and the filing of such a report supports inferences that a

proper report by a qualified expert was not available, the claim lacks merit, and the claim should be dismissed.

I would reverse the judgment of the court of appeals and dismiss the case. *See Badiga v. Lopez,* 274 S.W.3d 681, 684–85 (Tex.2009).



---

### Ex parte Tenika BROOKS.

### No. 12–06–00378–CR.

Court of Appeals of Texas,
Tyler.

June 20, 2007.

Discretionary Review Granted
Oct. 10, 2007.

**Background:** Defendant charged by indictment with aggregate theft applied for pretrial writ of habeas corpus. The 145th Judicial District Court, Nacogdoches County, Campbell Cox II, J., denied application, and defendant took interlocutory appeal.

**Holding:** The Court of Appeals, Brian Hoyle, J., held that it lacked jurisdiction to address merits of defendant's appeal.

Appeal dismissed.

---

**1. Criminal Law ⏄147, 157**

Prosecutions for theft as a felony must be initiated within five years of the theft; however, that period of limitations is tolled for the time that an indictment is pending. Vernon's Ann.Texas C.C.P. arts. 12.01(4)(A), 12.05(b).

**2. Criminal Law ⏄157**

Prior indictment tolls the statute of limitations when the subsequent indictment alleges the same conduct, same act, or same transaction. Vernon's Ann.Texas C.C.P. art. 12.05(b).

**3. Habeas Corpus ⏄463.1**

Defendant may challenge an indictment that, on its face, is barred by the statute of limitations by way of a pretrial application for writ of habeas corpus.

**4. Habeas Corpus ⏄463.1**

If an indictment alleges that the statute of limitations is tolled, the sufficiency of that tolling allegation may not be challenged by a pretrial writ of habeas corpus.

**5. Habeas Corpus ⏄463.1, 474**

Facially barred indictments that cannot be repaired have a defect that is incurable, and the statute of limitations is an absolute bar to prosecution, but a reparable indictment or tolling provision may be amended and any defect repaired; thus, the first is the proper subject of a pretrial application for habeas corpus, the second is not.

**6. Habeas Corpus ⏄814**

Appellate court lacked jurisdiction to address merits of theft defendant's interlocutory appeal from denial of her pretrial application for writ of habeas corpus, where defendant's complaint as to sufficiency of state's anticipated argument as to tolling of statute of limitations was not proper subject of pretrial application for writ of habeas corpus, and both imputed tolling allegation and indictment itself were reparable.

**7. Habeas Corpus ⏄275.1**

Trial court's decision to dismiss first indictment against defendant charged in second indictment with aggregate theft could not be raised by pretrial application for writ of habeas corpus, where defendant had remedies at law and potential injury resulting from delaying consideration of issue until after conviction and appeal was neither proximate nor serious; defendant had adequate remedies on appeal, or could file motion to dismiss or quash second